UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV07-380-GW(FFMx) | Date | April 22, 2013 |
| Title | *Michael Nozzi, et al. v. Housing Authority of the City of Los Angeles, et al.* | | |

Present: The Honorable  GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Anne Kielwasser | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

Barrett S. Litt
Paul J. Estuar
Stephanie Carroll
Patrick Dunlevy

Attorneys Present for Defendants:

Brant H. Dveirin
Michael S. Simon
Michael M. Mullins

PROCEEDINGS:    DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT BASED ON APPELLATE DECISION (filed 11/19/12)

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, Defendants' motion is continued to **May 23, 2013 at 8:30 a.m.** Simultaneous supplemental briefs will be filed by May 6, 2013. Simultaneous Replies, if any, will be filed by May 16, 2013.

:    45

Initials of Preparer    JG

*Nozzi v. Housing Auth. of the City of Los Angeles*, Case No. CV-07-380-GW(PJWx)
Draft Factual Portion of Tentative Ruling on Defendants' Renewed Motion for Summary Judgment and Two Issues Raised for Discussion

# I. Background
## A. Factual Background

The facts of this case are familiar to the parties and the Court,[1] although perhaps not to the Circuit Court, for whose convenience the following summary is included.

This case concerns the three separate circumstances relating to housing vouchers under the Section 8 Program administered by Defendant Housing Authority of the City of Los Angeles ("HACLA")[2].

    (1) HACLA's Lowering of the Section 8 Payment Standard Amount from 110% to 100% of the HUD Published FMRs in 2004

The Department of Housing and Urban Development ("HUD") publishes the fair market rents ("FMR") for each geographic market area in the United States. *See* 24 C.F.R. §§ 888.111, 982.503(a). A public housing authority ("PHA") (such as HACLA) "must establish payment standard amounts for each 'unit size'. . . . [with u]nit size [being] measured by number of bedrooms . . . ." *Id.* at 982.503(a)(1). A PHA has the discretion to "establish the payment standard amount for a unit size at any level between 90 percent and 110 percent of the [HUD] published FMR for that unit size." *Id.* at 982.503(b)(1); *see also* 42 U.S.C. § 1437f(o)(1)(B). "HUD approval is not required [for a PHA] to establish a payment standard amount in that range ('basic range')." 24 C.F.R. § 982.503(b)(1).

On or about April 5, 2004, HUD required HACLA to reduce expenditures to bring its spending on Section 8 housing assistance payments ("HAP") in line with the HUD budget at the time. *See* Plaintiffs' Separate Statement of Genuine Issues of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("PSSGI") at ¶ 10, Docket No. 76. Previously, HACLA had considered using its discretionary authority to take certain actions to reduce HAP expenditures, including lowering the voucher payment standard amount ("VPSA") within the prescribed basic range allowed by the above-cited statute and HUD regulations. *Id.* at ¶ 11. On March 26, 2004, HACLA's Board of Commissioners ("Board") voted to reduce the VPSA from 110% to 100% of the FMRs. *Id.* at ¶ 12. On August 25, 2004, a public hearing, with public comments, was held on HACLA's "Year 2005 Agency Plan" where the Board emphasized that the 2004 VPSA reduction would not take effect until the Spring of 2005. *Id.* at ¶ 14. Prior to the August hearing, copies of HACLA's draft of its 2005 Agency Plan, which included information relating to the VPSA reduction were made available at all HACLA offices. *Id.* at ¶ 15. In

---

[1] *See* Docket No. 63 at 1-6 (setting forth Plaintiffs' allegations and legal framework underlying Section 8 housing voucher program) and No. 90.

[2] Also named as a defendant herein is Rudolph Montiel in his official capacity as HACLA's Executive Director. Montiel was terminated by HACLA at the end of 2011.

addition, HACLA conducted approximately twenty outreach meetings at public housing sites and seven regional Section 8 meetings which included a slide show presentation detailing the effects of the 2004 VPSA reduction. *Id.* at ¶ 16.

In this case, Plaintiffs do *not* challenge: (1) the authority of HACLA to reduce the Section 8 payment standard amounts from 110% to 100% of the HUD published FMRs, (2) the propriety of the amount of the reduction, or (3) the procedure under which HACLA adopted that reduction, including the notices that were provided to the general public *before* the agency made that decision. *See* HACLA's Reply to Plaintiffs' Separate Statement of Undisputed Facts Responding to the Court's Questions to Parties ("HACLA's RPSS") at No. 1, Docket No. 179 at 10-11.[3]

> (2) <u>Steps Required under Federal Regulations before HACLA Can Effectuate a Decrease in the Section 8 Payment Standard Amounts during the HAP Contract Term</u>

42 U.S.C. § 1437f(o)(5)(B) requires:

> Each public housing agency administering [a Section 8] assistance [program] under this subsection shall establish procedures . . . to ensure that income data provided to the agency . . . by families applying for or receiving assistance from the agency is complete and accurate. Each public housing agency shall, not less frequently than annually, conduct a review of the family income of each family receiving assistance under this subsection.

Yearly conducted review of family income by a PHA is referred to as "reexamination" or "regular reexamination." *See, e.g.*, 24 C.F.R. §§ 5.216(e)(ii), 5.615(c)(3), 982.516(a).

A "payment standard" (which is the maximum monthly subsidy payment) is used to calculate the monthly HAP for a family. *See* 24 C.F.R. § 982.505(a). A PHA is supposed to pay a monthly HAP on behalf of the family that is equal to the *lower* of: (1) the payment standard for the family minus the total tenant payment, or (2) the gross rent minus the total tenant payment. *Id.* at § 982.505(b). The "total tenant payment" is defined in 24 C.F.R. § 5.628(a) generally as the "highest of the following amounts, rounded to the nearest dollar: (1) 30 percent of the family's monthly adjusted income; [or] (2) 10 percent of the family's monthly income . . . ." The "payment standard for the family" is the *lower* of: (1) the payment standard amount for the family unit (*i.e.* bedroom) size, or (2) the payment standard amount for the size of the dwelling unit rented by the family. 24 C.F.R. § 982.505(c)(1); *see also* HACLA's RPSS at No.2, pages

---

[3] After the briefing was completed on Defendants' renewed motion for summary judgment and prior to the hearing on that motion, this Court issued an Order requiring the parties to be prepared to address (and be able to supply the Court with references to the record in support of their answers) ten questions which the Court had in regards to certain relevant issues. *See* Docket No. 171. At the hearing, the Court required the parties to provide further written responses to those questions utilizing an expanded format for statements of material facts as delineated in Local Rule 56-2 (*i.e.* that Defendants would generate an initial set of answers to the Court's questions with references to supporting evidence in the record and to applicable law; the Plaintiffs would respond with their answers plus a statement of genuine issues of material fact as to Defendants' delineations; and the Defendants would submit a reply statement which would include their initial answers, the Plaintiffs' response, and finally the Defendants' counter to any factual or legal disagreements with Plaintiffs' responses). *See* Docket Nos. 173, 174, 176, and 179.

12-16. Because the total tenant payment amount is dependent upon the family's accurate income figure for each year (as established at the yearly reexamination), the actual amount of the monthly HAP for a Section 8 family cannot be set for more than one year because it is calculated using the family's annual income which is subject to change and verification. *See* HACLA's RPSS at No.2, pages 12-16.

Persons who apply and are accepted as participants in the Section 8 program are required to attend a "voucher issuance session" ("Session") prior to receiving any benefits. *See* Declaration of Agbor I. Agbor in Support of Defendants' Opposition to Motion for Summary Judgment at ¶ 4, Docket No. 78-4.[4] At the Sessions, HACLA staff explain to participants in detail the requirements of the Section 8 program including: (1) how their portion of rent is calculated, (2) "what the term Voucher Payment Standard ('VPS') means, and how the VPS is used to calculate both the participant's portion of the rent, known as Family Rent to Owner, and HACLA's portion of the rent, known as the Housing Assistance Payment ['HAP'] (also paid to the owner)," and (3) the use of "a HACLA worksheet entitled 'Estimate of Total Rent to Owner' . . . . which shows an estimated calculation of [the participant's] actual income, amount of the utility allowance, and the amount of the VPS for a certain size unit." *Id.* at ¶¶ 5-6; *see also Id.* at Exhibit Q.

Where there is a decrease in the Section 8 payment standard schedule effectuated by a PHA, that decrease can not go into effect immediately but, instead, "the lower payment standard amount generally must be used to calculate the monthly housing assistance payment for the family *beginning at the effective date of the family's second regular reexamination* following the effective date of the decrease in the payment standard amount." 24 C.F.R. § 982.505(c)(3) (emphasis added). Additionally, the three steps to be taken by the PHA (and when they are to be taken) in determining the actual payment standard (or amount) for each individual family based upon the decrease in the payment standard schedule is specifically delineated in 24 C.F.R. § 982.505(e)(3)(i) - (iii) as follows:

> (i) Step 1: At the first regular reexamination following the decrease in the payment standard amount, the PHA shall determine the payment standard for the family in accordance with paragraphs (c)(1) and (c)(2) of this section (using the decreased payment standard amount).
>
> (ii) Step 2 (first reexamination payment standard amount): The PHA shall compare the payment standard amount from step 1 to the payment standard amount last used to calculate the monthly housing assistance payment for the family. The payment standard amount used by the PHA to calculate the monthly housing assistance payment at the first regular reexamination following the decrease in

---

[4]While Plaintiffs object to the Agbor Declaration because it includes purported "inadmissible [and irrelevant] evidence, improper legal opinion, improper expert testimony, lacking foundation," and because Defendants failed to identify Agbor in their initial Rule 26 exchange and Plaintiffs have not been able to depose him. This Court rejects all of those contentions for the reasons delineated in HACLA's RPSS at No. 3, pages 18-21. Additionally, the Court notes that Agbor declares that he has worked at HACLA's Section 8 programs division since 1993 and has risen to the position of Manager, Issuance and Contracting for Section 8 programs. Thus, Plaintiffs objections based on foundation, relevance and the other evidentiary grounds are not well taken.

> the payment standard amount is the higher of these two payment standard amounts. The PHA shall advise the family that the application of the lower payment standard amount will be deferred until the second regular reexamination following the effective date of the decrease in the payment standard amount.
>
> (iii) Step 3 (second reexamination payment standard amount): At the second regular reexamination following the decrease in the payment standard amount, the lower payment standard amount shall be used to calculate the monthly housing assistance payment for the family unless the PHA has subsequently increased the payment standard amount, in which case the payment standard amount is determined in accordance with paragraph (c)(4) of this section.

In the present case, once HACLA adopted the decrease in the payment standard amount, it sent out written notice of the 2004 VPSA reduction ("Reduction Notice") to each Housing Choice Voucher Program participant on or about the date of the participant's annual reexamination, a "full" year before the 2004 VPSA reduction was to go into effect. *See* PSSGI at ¶ 17.[5] The Reduction Notice stated that:

> Effective April 2, 2004, the Housing Authority lowered the payment standards used to determine your portion of the rent. We will not apply these lower payments standards until your next regular reexamination. If you move, however, these new lower payment standards will apply to your next unit.

*Id.* at ¶ 18. Additionally, it is not disputed herein that the Reduction Notice also contained a chart that listed the new payment standard amounts (following the reduction) by bedroom size. *Id.* at ¶ 19. The Reduction Notice also included a document entitled "Notice of Review Determination – Change in Tenant Rent &/or HAPP Subsidy" (marked as form "HAPP RE-38") (henceforth referenced as the "initial RE-38") which showed the amount of rent each participant would be required to pay the landlord/owner and the amount the HACLA would pay the landlord/owner on the participant's behalf for that upcoming year.[6] *Id.* at ¶ 22; *see also* Exhibit J to Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment ("Appendix"), Docket No. 74. The initial RE-38 also informed the Section 8 participant that "You have the right to a hearing if you wish to dispute this action" and provided a telephone number to contact within thirty days to request such a hearing. *Id.*

---

[5] For purposes of the present renewed summary judgment motion, Defendants have not prepared a new statement of undisputed facts ("SUF") but instead refer to the SUF prepared in connection with their previous summary judgment motion, originally filed at Docket No. 69. Plaintiffs' statement of genuine issues ("PSSGI") is found at Docket No. 76. The cited paragraphs of the SUF which are not substantially disputed in any pertinent part by Plaintiffs are referenced to the PSSGI which includes both the Defendants' SUF and Plaintiffs' response to it.

[6] The Court's questions numbers 5 and 6 inquired whether the chart and the initial RE-38 form were familiar to Section 8 participants because they (or reasonable similar documents) had been provided to such participants by HACLA in the past. Defendants responded that the type and format of the chart and the initial RE-38 were standard and had been used by HACLA for years. *See* HACLA RPSS at Nos. 5 and 6, pages 25-27.

It is not disputed that neither the Reduction Notice or the initial RE-38 could actually state the final rent that a Section 8 tenant would have to pay after the 2004 VPS reduction took effect because a number of factors particular to that tenant other than the VPS decrease would have to be established and further calculations made. *See* HACLA's RPSS at Nos. 4 and 7, pages 22 and 28-31. As pointed out by Defendants, "the VPS notice [of reduction] is a notice of [the] VPS decrease, and not a notice of rent increase, and that until the new lower VPS is applied a year later (when the second RE-38 issues), it is impossible to say how the VPS (lowered a year earlier) will affect participants." *Id.* at page 23.

Approximately one year later and four weeks before the 2004 reduction actually went into effect, each participant received another HAPP RE-38 (henceforth referenced as "second RE-38") which detailed: (1) the change (if any) in the amount of the monthly HAP that HACLA would be paying the landlord/owner and the starting date of that change, and (2) the increase (if any) that the participant would have to pay the landlord/owner as to the monthly rent. PSSGI at ¶ 24; *see also* Exhibit K to Appendix. It is not disputed that the second RE-38 stated the new rent (following the VPS reduction and the new calculations based upon the second reexmination) correctly. HACLA's RPSS at No. 8, page 32. The second RE-38 also notified recipients of their right to a hearing if they wished to dispute any of the actions reference in the document and provided them with a telephone number to initiate the process and stated that they had 30 days to begin the process. *Id.*

### (3) Availability of Hearings to Challenge Reductions of Section 8 Payment Standards

24 C.F.R § 982.555 delineates those situations where a PHA must give a participant family an opportunity for an informal hearing, and those circumstances where such a hearing is not required. Section 982.555 does not specifically deal with the situation where a PHA decides to decrease the Section 8 payment standard amount within the confines of the basic range.

Nevertheless, it is not disputed herein that, when HACLA sent out the second RE-38 notices to the Section 8 participants about four weeks before the 2004 VPSA reductions would go into effect, the participants were informed of the amount of the decrease in the HAP that HACLA would be paying to the landlord/owner on the participant's behalf and the precise increase in the amount of the rent that the participant family itself would have to pay. In addition, the participant was informed that: "You have the right to a hearing if you wish to dispute this action." *See* Exhibit K to Appendix. The participant was given 30 days from the date of the second RE-38 notice to contact the agency by phone to schedule a hearing.[7] *Id.*

Defendants specifically provided evidence that it is not disputed that the hearings provided by HACLA pursuant to the initial and the second RE-38's are consistent with the provisions of 24 C.F.R. § 982.555. *See* HACLA's RPSS at No. 9, at pages 33-34. Plaintiffs have indicated that they are "not challenging the hearing process." *Id.*

---

[7] As noted in Judge Michael M. Mosman's concurrence in *Nozzi v. Housing Authority of the City of Los Angeles*, 425 F. App'x 539, 543 (9th Cir. 2011), "[a]t oral argument plaintiff's counsel conceded that plaintiffs who were actually going to have Section 8 benefits reduced were granted notice and a hearing before any reduction in those benefits." *See also* HACLA's RPSS at No. 9, at pages 33-34.

### B. Procedural Background

On November 26, 2007, this Court granted Defendants' motion to dismiss Plaintiffs' second and fifth causes of action, namely one of Plaintiffs' claims arising under 42 U.S.C. § 1983, and Plaintiffs' negligence claim. Docket No. 63. On March 8, 2009, this Court granted Defendants' motion for summary judgment as to Plaintiffs' remaining causes of action. Plaintiffs timely appealed, and the Ninth Circuit issued a memorandum opinion on March 25, 2011, affirming in part, reversing in part, and remanding "for proceedings consistent with" the panel's written opinion. *See Nozzi*, 425 Fed. App'x 539 (9th Cir. Mar. 25, 2011) (the "Ninth Circuit Ruling"). The Honorable Michael W. Mosman, District Court Judge for the District Court of Oregon, sitting on the appellate panel by designation, filed a concurring opinion (the "Ninth Circuit Concurrence"). *See id.* at 543.

The Ninth Circuit held that this Court "did not err in dismissing the plaintiffs' § 1983 claim to enforce the notice requirement in the regulation . . . . [because] agency regulations cannot create a federal right enforceable under § 1983." *Nozzi*, 425 F. App'x at 543. The Circuit Court did not find that HACLA acted improperly in exercising its discretion to lower the Section 8 payment standard amounts from 110% to 100% of the HUD published FMRs. Nor did the Circuit Court refer to the undisputed facts in this case that, one year prior to the effectuation of any reduction in the HAP, Section 8 participants were given written notice that: (1) HACLA had "lowered the payment standards used to determine [the participant's] portion of the rent," (2) the new payment standards would be effective on April 2, 2004, but HACLA would "not apply these lower payment standards until [the participant's] next regular reexamination" approximately one year later, and (3) four weeks before the actual application of the lowered payment standards, each individual participant was notified in writing as to the precise changes in the payment amounts and the availability of informal hearings to raise any challenges to the application of the lowered amounts in their cases. Nevertheless, the Circuit Court held that this Court erred in failing to apply the factors established in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), to the present situation; but it is somewhat unclear as to what exact portion of the "circumstances presented here" the *Mathews* factors are to be applied. As noted above, there are three circumstances involved herein: (1) the initial decision by HACLA to lower the Section 8 payment standard amount, (2) the steps taken by HACLA as required by 24 C.F.R. § 982.505(c)(3) to notify Section 8 participants of the reduction and to inform them that the reduction would not be effectuated until one year later, and (3) the second RE-38 notice given at least four weeks prior to the effectuation of the reduction which informed the Section 8 participants of the precise changes in the payment amounts (which had to be based on their most recent reexamination and therefore could not be calculated earlier) and which also notified them of the availability of informal hearings.

The parties have submitted statements as to the impact of the Ninth Circuit Ruling. Docket Nos. 138, 139. Meanwhile, the parties pressed on with discovery (*see, e.g.*, Docket No. 168 (stipulation concerning electronic discovery)), and the Court set a July 18, 2013 hearing date for Plaintiffs' anticipated motion for class certification (*see* Docket No. 160). Presently before the Court is Defendants' "renewed motion for summary judgment as to appellate decision." Docket No. 158.

### Two Additional Issues

**(1) Standing**

"[F]ederal courts are required sua sponte to examine jurisdictional issues such as standing." *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999). How is it that Plaintiffs have standing to challenge the initial VPS reduction notice sent to the Section 8 participants by HACLA in this Action? Plaintiffs admit not only that there had been no actual reduction in benefits when the initial VPS notice was sent, but also that it was impossible to determine the amount of the reduction, if any, for specific participants. *See, e.g.*, Pl. Opp. at 13, Pl. Resp. ¶ 2. To establish Article III standing, a plaintiff must show "(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See Nuclear Info. and Res. Serv. v. Nuclear Regulatory Com'n*, 457 F.3d 941, 949 (9th Cir. 2006). The Court is unclear as to how Plaintiffs' injury is "fairly traceable to the challenged action," i.e. HACLA's initial VPS reduction notice, given Plaintiffs' concession that "the precise final amount of the HAP for the next year could not be determined a year in advance" (Pl. Resp. ¶ 2) and, more importantly, that no "opportunity to be heard was required when the initial [VPS notice] was sent." Pl. Opp. at 13. Plaintiffs concede that "[t]he right to a hearing arose when notice of the specific application of the VPS change was sent 30 days before the change took effect" because "that notice set forth the specifics of the VPS reduction as applied to that individual." *Id.*

In light of the fact that reduction in Section 8 benefits were unknowable a year in advance (and, indeed, whether the reduction in the VPSA would definitely result is a concomitant increase is the Section 8 participant's obligated portion of the monthly rent), the connection between the initial VPS notice and Plaintiffs' ultimate harm (if any) appears too speculative to establish the causation required for standing. Moreover, given that Plaintiffs do not "contend that individual hearings are appropriate to challenge an across-the-board VPS change," (Pl. Resp. ¶ 9) it is unclear how any requested remedy aimed at the initial VPS reduction notice would be more effective at redressing the challenged injury than the specific hearings that were offered to Plaintiffs 30 days in advance of the actual reductions – especially because, again, it was simply not possible to calculate the exact reductions a full year in advance. Therefore – though not addressed in the parties' briefing – the Court would ask the parties to discuss whether Plaintiffs have satisfied the elements of standing (including causation and redressability) with respect to the 2004 VPS reduction notices (which includes the initial RE-38 notice) that they challenge. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568, (1992) ("[S]uits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations . . . . , even when premised on allegations of several instances of violations of law, . . . are rarely if ever appropriate for federal-court adjudication" (quoting *Allen v. Wright*, 468 U.S. 737, 759-760 (1984))).

**(2) Plaintiffs' Claims for Violation of Government Code § 815.6 and Negligence**

The Ninth Circuit held:

> The district court incorrectly concluded that the notice provided by defendants satisfied the mandatory duty in [24 C.F.R.] § 982.505 to provide one-year notice before implementing the reduced VPS. California Government Code § 815.6 permits private individuals to sue public entities where: (1) an enactment imposes a mandatory duty; (2) it is intended to protect the individual from the type of injury suffered; and (3) the breach of the mandatory duty was the proximate cause of the injury suffered. Cal. Gov't Code § 815.6. At a minimum, the notice must be sufficiently effective to protect housing benefits recipients from an abrupt and unexpected reduction of benefits. It is a question of fact whether the "literal compliance" that occurred here was sufficient to meet § 815.6's requirements.

*Nozzi v. Housing Authority of the City of Los Angeles,* 425 F. App'x 539, 542 (9th Cir. 2011).

    Given that Plaintiffs in this case do *not* challenge: (1) the authority of HACLA to reduce the Section 8 payment standard amounts from 110% to 100% of the HUD published FMRs, (2) the propriety of the amount of the reduction, (3) the procedure under which HACLA adopted that reduction, or (4) the fact that HACLA sent out to the Section 8 participants the VPS Reduction Notice plus the initial and second RE-38 notices, it is unclear to this Court what the Ninth Circuit meant when it said that "The district court incorrectly concluded that the notice provided by defendants satisfied the mandatory duty in [24 C.F.R.] § 982.505 to provide one-year notice before implementing the reduced VPS." The nature of the failure to comply with Section 982.505 is not explained by the Circuit and cannot be discerned from the relevant statute and regulation.

    Additionally, the Circuit held that "The district court did not err in dismissing plaintiffs' § 1983 claim to enforce the notice requirement in the regulation. Under *Save Our Valley v. Sound Transit,* 335 F.3d 932 (9th Cir. 2003), agency regulations cannot create a federal right enforceable under § 1983." *Nozzi,* 425 F. App'x at 542. While the Ninth Circuit held that "[t]echnical compliance with regulatory procedures does not automatically satisfy *due process* requirements," that does not answer the separate question of how Plaintiffs may assert a viable claim under § 815.6 if HACLA indisputably complied with what is required by applicable statute and regulation. Put differently, even if such compliance with the regulations is insufficient *under the Constitution,* how can *total compliance with regulations* form the basis for a negligence claim or a violation of § 815.6? How is it possible that compliance with regulations (*i.e.* the mandatory duty) can be a "breach" within the meaning of § 815.6?

    Similarly, what is the "injury" caused by HACLA's compliance with the law? The reduction was authorized by statute and regulation. Do Plaintiffs argue that they were injured by Defendants' failure to give *more* notice than what was required by the regulations? Furthermore, given that the benefits reduction was not actually applied for at least a year following (1) the first VPS Reduction Notice and (2) after at least four weeks from the second RE-38 notice (and even then only after a hearing if requested by a Section 8 participant), how is it that HACLA's initial VPS notice *proximately caused* any "injury" to Plaintiffs?