BARRETT S. LITT (SBN 45527)
*blitt@kmbllaw.com*
KAYE, McLANE, BEDNARSKI & LITT, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (213) 386-3114
Facsimile: (213) 380-4585

ANNE K. RICHARDSON (SBN 151541)
*arichardson@publiccounsel.org*
STEPHANIE CARROLL (SBN 263698)
*scarroll@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089
Attorneys for Plaintiffs
MICHAEL NOZZI, et al.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL NOZZI, et al., <br><br> Plaintiff, <br><br> v. <br><br> HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, et al., <br><br> Defendants. | Case No. CV07-00380-PA (FFMx) <br><br> [Honorable Percy Anderson] <br><br> PLAINTIFFS' *AMENDED* NOTICE OF MOTION AND MOTION TO CERTIFY CLASS UNDER F.R.CIV.P. RULES 23(b)(2) and 23(c)(3); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS <br><br> Date:     May 9, 2016 <br> Time:     1:30 P.M. <br> Place:    Courtroom 15 <br> Complaint Filed:  January 16, 2007 <br> Trial Date:    None Set |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................... - 1 -

II.   STATEMENT OF FACTS ........................................................ - 2 -
      A. Overview Of The Section 8 Housing Choice Voucher Program ............ - 2 -
      B. HACLA's 2004 VPS Decrease ............................................ - 4 -
      C. The First Round Of Litigation And The First Ninth Circuit  Decision .... - 6 -
      D. Proceedings After The First Ninth Circuit Decision ................................ - 7 -
      E. *Nozzi II* and Proceedings Thereafter ........................................ - 8 -

III. THE PROPOSED CLASS DEFINITION ...................................... - 9 -

IV. PLAINTIFFS MEET THE CRITERIA TO CERTIFY THE CLASS. ........ - 10 -
      A. Plaintiffs Meet The Requirements Of Rule 23(a). ................. - 11 -
            *1.  Numerosity* ..................................................... - 11 -
            *2.  Commonality* ................................................... - 12 -
            *3.  Typicality* ...................................................... - 14 -
            *4.  Adequacy of Representation* ............................... - 15 -
      B. The Requirements Of Rule 23(B)(2) and (3) Are Met ................. - 18 -
            *1.  Common Questions of Law or Fact Predominate* ............ - 18 -
            *2.  The Other 23(b)(3) Considerations Favor Certification* .......... - 21 -

V.  THE NINTH CIRCUIT'S DECISION IN NOZZI II AT LEAST
     IMPLICITLY DECIDED MANY OF THE RULE 23 ISSUES. ............... - 22 -

VI.  CONCLUSION ...................................................................... - 25 -

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amchem Products, Inc. v. Windsor*
   521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) .............................. 18, 19

*Armstrong v. Davis*
   275 F.3d 849 (9th Cir. 2001) ........................................................................ 12

*Bellinghausen v. Tractor Supply Co.*
   303 F.R.D. 611 (N.D. Cal. 2014) ................................................................. 15

*Blackie v. Barrack*
   524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976) ............... 11, 16

*Califano v. Yamasaki*
   442 U.S. 682 (1979) ..................................................................................... 13

*Crown, Cork, & Seal Co. v. Parker*
   462 US 345 (1983) ....................................................................................... 10

*Dennis v. Kellogg Co.*
   2013 WL 1883071 (S.D. Cal. 2013) ........................................................... 12

*Diaz v. Trust Territory of Pacific Islands*
   876 F.2d 1401 (9th Cir.1989) ...................................................................... 16

*Eichman v. Fotomat Corp.*
   880 F.2d 149 (9th Cir. 1989) ....................................................................... 23

*Ellis v. Costco Wholesale Corp.*
   285 F.R.D. 492 (N.D.Cal. 2012) ................................................................. 13

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*
   2015 WL 4776932 (C.D. Cal. May 27, 2015) ............................................ 20

*Fraser v. Wal-Mart Stores, Inc.*
   2014 WL 7336673 (E.D. Cal. 2014) ........................................................... 22

*Gay v. Waiters' & Dairy Lunchmen's Union*
   549 F.2d 1330 (9th Cir.1997) ...................................................................... 11

*General Telephone Co. of Southwest v. Falcon*
   457 U.S. 147 (1982) ................................................................................. 10, 14

*Gray v. Golden Gate Nat. Recreational Area*
    279 F.R.D. 501 (N.D. Cal. 2001) ........................................................ 13

*Haley v. Medtronic, Inc.*
    169 F.R.D. 643 (C.D. Cal. 1996) ........................................................ 21

*Hall v. City of Los Angeles*
    697 F.3d 1059 (9th Cir. 2012) ........................................................ 23

*Hanlon v. Chrysler Corp.*
    150 F.3d 1011 (9th Cir. 1998) ........................................................ 14

*Hanon v. Dataproducts Corp.*
    976 F. 2d 497 (9th Cir. 1992) ........................................................ 14

*Hassine v. Jeffes*
    846 F.2d 169 (3rd Cir. 1988) ........................................................ 14

*In re Northern District of California, Dalkon Shield IUD Products Liability
Litigation*
    693 F.2d 847 (9th Cir.1982) ........................................................ 15, 21

*International Molders' and Allied Workers' Local Union No. 164 v. Nelson*
    102 F.R.D. 457 (N.D. Cal. 1983) ........................................................ 11

*Ischay v. Barnhart*
    383 F. Supp. 2d 1199 (C.D. Cal. 2005) ........................................................ 23

*Jimenez v. Allstate Ins. Co.*
    765 F.3d 1161 (9th Cir. 2014) ........................................................ 12

*Johnson v. California*
    543 U.S. 499, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) ........................................................ 12

*Keilholtz v. Lennox Hearth Products Inc.*
    268 F.R.D. 330 (N.D. Cal. 2010) ........................................................ 12

*Klay v. Humana, Inc.*
    382 F.3d 1241 (11th Cir. 2004) ........................................................ 20

*L.H. v. Schwarzenegger*
    2007 WL 662463 (E.D. Cal. 2007) ........................................................ 12

*Leyva v. Buley*
    125 F.R.D. 512 (E.D.Wash.1989) ........................................................ 11

*Leyva v. Medline Indus.*
   716 F.3d 510 (9th Cir. 2013) ............................................................. 20

*Mathews v. Eldridge*
   424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ........................... 1, 2

*Melendres v. Arpaio*
   784 F.3d 1254 (9th Cir. 2015) ........................................................... 11

*Mullins v. Direct Digital, LLC*
   795 F.3d 654 (7th Cir. 2015) ............................................................. 11

*Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles*
   246 F.R.D. 621 (C.D.Cal. 2007) ....................................................... 11

*Munoz v. PHH Corp.*
   No. 2013 WL 3935054 (E.D. Cal. July 29, 2013) ............................. 16

*Negrete v. Allianz Life Ins. Co. of N. Am.*
   238 F.R.D. 482 (C.D. Cal. 2006) ...................................................... 20

*Nozzi v. Hous. Auth. of City of Los Angeles*
   425 F. App'x 539 (9th Cir. 2011) ........................................................ 1

*Nozzi v. Hous. Auth. of City of Los Angeles*
   806 F.3d 1178 (9th Cir. 2015) .....................................................passim

*Phillips Petroleum Co v. Shutts*
   472 U.S. 797 (1985) .......................................................................... 11

*Polanco v. Schneider Nat. Carriers, Inc.*
   2012 WL 10717265 (C.D. Cal. Apr. 25, 2012) ................................. 16

*Quern v. Jordan*
   440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) ....................... 23

*Riordan v. Smith Barney*
   113 F.R.D. 60 (N.D.Ill.1986) ............................................................ 15

*Smilow v. Sw. Bell Mobile Sys., Inc.*
   323 F.3d 32 (1st Cir. 2003) ............................................................... 20

*Stanton v. Boeing*
   327 F.3d 938 (9th Cir. 2003) ............................................................ 14

*Tanne v. Autobytel, Inc.*
  226 F.R.D. 659 (C.D. Cal. 2005)..................................................15

*Trief v. Dun & Bradstreet Corp.*
  144 F.R.D. 193 (S.D.N.Y.1992)..................................................16

*Tyson Foods, Inc. v. Bouaphakeo*
  __ U.S. __, 2016 WL 1092414 (Mar. 22, 2016) ...................11, 18, 20

*Wal–Mart v. Dukes*
  564 U.S. 338, 131 S.Ct. 2541 (2011) ....................................12, 13, 18

*Wolph v. Acer America Corp.*
  272 F.R.D. 477 (N.D. Cal. 2011) .........................................21

### OTHER CASES

*Michael Nozzi v. HACLA*
  09-55588 ................................................................7

### FEDERAL STATUTES

42 U.S.C. § 1437f .........................................................2

42 U.S.C. § 1437f(c) ......................................................3

42 U.S.C.  § 1437f(c)(2)(A) ...............................................3

42 U.S.C. § 1437f(o) ....................................................2, 3

### OTHER STATUTES

Civil Code § 815.2 ......................................................5, 7

Civil Code § 815.6 .......................................................5

### RULES

Rule 23 ...........................................................2, 9, 22, 23

Rule 23(a).......................................................11, 14, 18, 24

Rule 23(a)(4) ...........................................................17

Rule 23(b) .........................................................11, 18

v

Rule 23(b)(2) ............................................................... 17, 9, 18

Rule 23(b)(3) ................................................................... passim

Rule 23(g) ................................................................................ 17

Rule 23(g)(1) ........................................................................... 17

## REGULATIONS

24 C.F.R. § 982.1(a) ................................................................ 2

24 C.F.R. § 982.201 ................................................................ 3

24 C.F.R. § 982.302 ................................................................ 3

24 C.F.R. § 982.501 *et seq.* ................................................... 3

24 C.F.R. § 982.503(b)(1)(i) .................................................. 3

24 C.F.R. § 982.505(c)(3) ....................................................... 4

24 C.F.R. § 982.516 ................................................................ 4

## CONSTITUTIONAL PROVISIONS

Fourth Amendment ................................................................ 11

## OTHER AUTHORITIES

4478 Law of the Case, 18B *Fed. Prac. & Proc. Juris.* § 4478 (2d ed.) .................. 23

7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005) ............................................................... 19

Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed.) (hereafter "*Newberg*") ........................................................................ passim

**TO THE COURT, ALL PARTIES HEREIN, AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on May 9, 2016 at 1:30 p.m. in Courtroom No. 15, 316 North Spring Street, Los Angeles, California 90012. Plaintiffs will, and hereby do, move this Court for an Order certifying the following class under F.R.Civ.P. Rules 23(b)(2) and 23(b)(3):

Rule 23(b)(2):

> All Section 8 beneficiaries who in the past received, or in the future may receive, notices of a Voucher Payment Standard decrease.

Rule 23(b)(3):

> All Housing Authority of the City of Los Angeles (HACLA) Section 8 tenants, between June 1, 2005, and September 30, 2006,  whose rental contribution  for a period not to exceed eleven months was greater than it would have been but for Defendant HACLA's 2004 decrease in the Voucher Payment Standard.

This motion is based on the accompanying Memorandum of Law, the accompanying Declarations and/or exhibits, the decisions of the Ninth Circuit in this case, the files and records in this case, and such evidence as may be adduced at a hearing on this motion.

Dated: April 1, 2016                       Respectfully submitted,

KAYE, MCLANE, BEDNARSKI & LITT

By:__/s/ Barrett S. Litt_____
 Barrett S. Litt

PUBLIC COUNSEL

By:__/s/ Anne K. Richardson_____
 Anne K. Richardson
 Attorneys for Plaintiffs

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The essential facts of this case, and the undisputed facts supporting Plaintiffs' claims, are fully set out in the Ninth Circuit's opinion in *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178 (9th Cir. 2015), as amended on denial of reh'g and reh'g en banc (Jan. 29, 2016) ("Nozzi II"), and are  summarized in this motion. The core issue in this case has always been whether the putative class of Section 8 beneficiaries whose Voucher Payment Standard ("VPS") was reduced pursuant to a decision made by the Housing Authority of the City of Los Angeles ("HACLA") in 2004 were deprived of due process of law (and of rights under parallel state law claims). Under mandatory Department of Housing and Urban Development ("HUD") regulations, "public housing agencies" ("PHA") that wish to reduce the VPS must provide one year's advance notice during their annual reexamination of tenant benefits. This notification is required because a VPS reduction means that, all other things being equal, the PHA will be contributing less to the tenant's Section 8 rent, and the tenant will be contributing more. The notification is intended to provide ample time for the tenant to prepare for the fact that s/he will be contributing more.

Plaintiffs contended that the notice was defective as a matter of law because it mirrored the technical language of the federal regulations, and did not reasonably communicate the potential adverse effect of the reduced VPS. The Ninth Circuit reversed summary judgment in favor of Defendants in *Nozzi v. Hous. Auth. of City of Los Angeles*, 425 F. App'x 539 (9th Cir. 2011) (*Nozzi I*) and remanded for further proceedings to address "whether HACLA's notice sufficiently protected plaintiffs' property interest," 425 F. App'x at 542, under the standards of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Because there were material issues of disputed fact, the class certification motion, at that time, needed to address how the class due process (and related

1    claims) question would be answered.

2        On remand, class database discovery began, and the first round of data

3    production occurred shortly before the District Court again granted summary

4    judgment. In *Nozzi II*, the Ninth Circuit reversed and concluded, applying

5    *Mathews* to the undisputed facts, that Plaintiffs were entitled to summary

6    judgment on liability. As a result, Plaintiffs now need not show how they would

7    answer the common liability question because it has already been answered. This

8    Court has set July 18, 2016, as the cutoff date for a hearing on class certification.

9    Plaintiffs have filed this motion to be heard well in advance of that date so that, in

10   the event of any unforeseen concern the Court may express regarding whether the

11   Rule 23 criteria are met, they will have sufficient time to make any necessary

12   corrections before the July 18 cutoff date. As Plaintiffs elaborate below, they

13   believe that the Rule 23 considerations are quite straightforward in light of *Nozzi*

14   *II* and that that decision has answered, directly or by necessary implication, most

15   of the Rule 23 questions.

16   **II.    STATEMENT OF FACTS**

17       The facts contained in Sections A and B below, unless otherwise indicated,

18   are a compressed version of the facts as presented in *Nozzi II*, which were taken

19   from undisputed facts in the summary judgment record. 806 F.3d at 1199–1200.

20       **A.    Overview Of The Section 8 Housing Choice Voucher Program**

21       In 1974, Congress created the Section 8 housing program in order to "aid [ ]

22   low-income families in obtaining a decent place to live" and "promot[e]

23   economically mixed housing." 42 U.S.C. § 1437f). The program provides rental

24   assistance to low-income, elderly, and disabled families.

25       The majority of federal housing assistance takes place through the Housing

26   Choice Voucher Program, which subsidizes the cost of renting privately-owned

27   housing units. 42 U.S.C. § 1437f(o). The Voucher Program is funded and

28   regulated by HUD and is administered at the local level through local PHAs. 24

C.F.R. § 982.1(a).

The PHAs determine which individuals are eligible to participate in the program. Eligible individuals receive a voucher entitling them to search for qualifying privately-owned housing. 24 C.F.R. § 982.201; 24 C.F.R. § 982.302. Upon the participant's locating a unit, the PHA and unit owner negotiate and enter into a "housing assistance payment" ("HAP") contract, which *inter alia* specifies the maximum monthly rent that the owner may charge. 42 U.S.C. § 1437f(c). The PHA then makes subsidy payments to the unit owner on the tenant's behalf.

Calculation of the tenant subsidy is extensively regulated. *See* 42 U.S.C. § 1437f(o); 24 C.F.R. § 982.501 *et seq.* First, HUD sets the fair market rent for established geographic areas (24 C.F.R. § 982.503(a)(1)). The PHA then establishes the VPS schedule amounts for each of its fair market rent areas. 24 C.F.R. § 982.503(a)(1). The VPS is the PHA's maximum subsidy payment for each type of apartment in the area, *id.*, and generally must be set between 90 and 110% of the fair market rent for the area. 24 C.F.R. § 982.503(b)(1)(i).

All tenants are responsible for contributing the greater of 30% of their monthly adjusted income or 10% of their gross monthly income. 42 U.S.C. § 1437f(c)(2)(A). Tenants whose rental units cost more than the payment standard have a higher expected contribution. Such tenants must *also* pay any amount by which their rent exceeds the established payment standard. 42 U.S.C. § 1437f(*o*)(2)(B). In either case, the subsidy covers the balance of the rent.

Practically, the formula for calculating a tenant's expected rent contribution means that a decision by the PHA to increase the payment standard will generally yield larger subsidies. By contrast, a decrease in the payment standard will generally decrease subsidies and may increase the rental contribution of a substantial number of tenants.

Beneficiaries (used interchangeably here with "tenants") have a one-year period of stable benefits in which to plan for changes to the payment standard that

- 3 -

may adversely affect their subsidy amount and rent contribution. The PHA conducts an annual examination of each beneficiary, usually on the anniversary of the beneficiary's entry into the Section 8 program, to verify his/her continued eligibility for benefits and to calculate his/her expected rent contribution for the immediately upcoming year. *See* 24 C.F.R. § 982.516. Alterations to a tenant's benefits may occur due to circumstantial changes (e.g., tenant's income, family composition, rental cost), but the regulations limit the discretion to lower the payment standards (and therefore the rent subsidy). If the PHA decides to lower the payment standards, it must provide information about the change to all beneficiaries at their annual reexaminations following the decision, and must further advise these beneficiaries that the change will not go into effect until their following reexamination one year later. *See* 24 C.F.R. § 982.505(c)(3).

Thus, the tenant receives one year advance notice of any adverse change, which protects beneficiaries against sudden decreases in subsidy. Absent any change to a beneficiary's circumstances, s/he can be assured that the rent subsidy will renew with, at a minimum, the same terms as the prior year unless he had been warned a year previously of an adverse change to the subsidy. The regulations thus require that the beneficiary receive notice at least a year in advance that the payment standard has been decreased for the future rent subsidy.

## B.    HACLA's 2004 VPS Decrease

HACLA administers the Voucher Program for Los Angeles. In 2004, HUD required HACLA to limit spending in order to balance its 2004 budget. To accomplish this, HACLA reduced the payment standard from 110% of the 50th percentile of rents in Los Angeles County to 100% of the 40th percentile of rents. HACLA's Board estimated that "approximately 45% of its approximately 45,000 Section 8 tenants would be adversely affected by the April 2004 decrease, and would have to pay an average of $104 more in rent each month if they chose to remain in their current units." 806 F.3d at 1186. That year, HACLA instructed its

staff to attach a copy of a flyer to each Section 8 beneficiary's "notice of review determination" or "RE–38." The RE–38 is a form sent annually to all Section 8 beneficiaries at the time of their annual reexamination that confirms their renewed eligibility for benefits and sets forth their rent contribution and subsidy amount for the immediately upcoming year.

This "one-year notice" (a copy of which is reproduced at the conclusion of *Nozzi II*, and, for the Court's convenience, is attached as an Appendix to this Memorandum) was a brief flyer that is the subject of this lawsuit. (The challenge to the notice is discussed further below.) Approximately one year after the advance notice was sent, and only thirty days before the changes to the payment standard  that would adversely affect the tenants' subsidies and rent contributions were scheduled to be implemented, HACLA sent a new notice of review determination. This "four-week notice" set forth the tenants' subsidies and rents for the upcoming year using the new, lowered payment standard, and was the first time that tenants were actually notified that the change would affect them personally or that there would be an increase to their rent contributions.

Plaintiffs Michael Nozzi and Nidia Palaez, together with the Los Angeles Coalition to End Hunger and Homelessness, brought this suit on behalf of a putative class of adversely affected Section 8 beneficiaries, and challenged the lawfulness of the one-year notice on the ground that it was not comprehensible, and did not adequately communicate the meaning and effect of the change, as was required by the regulations. Plaintiffs alleged that, as a result, Defendants violated Plaintiffs' right to due process of law in that their property interest in their benefits encompassed their right to advance notice of an adverse payment standard change, due process required that notice be effective and reasonably communicate the adverse effect, and the notice sent did not meet that standard. Plaintiffs also challenged the notice under state law for violation of a mandatory duty (Civil Code § 815.6) and negligence (Civil Code § 815.2). (As we explain infra at

§IV(A)(4), Plaintiffs seek only to appoint Ms. Peleaz as a class representative.)

Plaintiff Michael Nozzi, a Section 8 beneficiary since December 2003, is totally and permanently disabled under Social Security's standards. As a result of the 2004 change, his expected rent contribution increased 48%—from $231 to $342 per month. (Because Plaintiff Nozzi has not been available to submit a class representative declaration, Plaintiffs are not proffering him to act as a class representative.)

Plaintiff Nidia Pelaez, a beneficiary since February 2004, is a single mother with a young daughter. She experienced a 177% increase in her portion of the rent as a result of the 2004 change. She alleged that this increase has adversely affected her family's quality of life, that she has had difficulty affording suitable school clothes for her daughter, and that she has had to divert money from her food budget to cover her increased rent costs. (Ms. Peleaz has filed a class representative declaration and is proffered to act as a class representative.)

Both Nozzi and Palaez stated they did not understand that their Section 8 benefits would decrease and their own rent obligations would increase until they received notices approximately one year after the flyer, four weeks before the change in the payment standard adversely affected their rent contributions. Neither recalls receiving the original flyer, and neither could comprehend it when it was later shown to them.

**C.     The First Round Of Litigation And The First Ninth Circuit Decision**

The original Complaint in this action was filed on January 16, 2007. [Doc. #1.] The Parties filed cross-Motions for Summary Judgment in February 2008. [Doc. #67 and 68.] Judge Wu granted Defendants' Motion for Summary Judgment on March 8, 2009. [Doc. #90.]

Plaintiffs appealed. The Ninth Circuit reversed summary judgment in *Nozzi I* and remanded for further proceedings. It concluded that "there exists a genuine

1   issue of material fact as to whether HACLA's notice sufficiently protected

2   plaintiffs' property interest [under the due process clause]," and that it was "a

3   question of fact whether the 'literal compliance' that occurred here was sufficient

4   to meet § 815.6's requirements." *Id*. at 542. Based on comments made at the oral

5   argument by Circuit Judge Trott regarding determining whether the average

6   Section 8 tenant would have understood the notice, Plaintiffs proceeded below on

7   the understanding that that was the core remaining issue. Declaration of Barrett S.

8   Litt (hereafter "Litt Dec."), ¶15.

9        **D.**     **Proceedings After The First Ninth Circuit Decision**

10       After remand, efforts to obtain the class database information proceeded,

11   but were very protracted. Plaintiffs' database discovery was  intended to answer

12   the question of whether Defendants' notice was effective notice. The database

13   discovery would allow Plaintiffs to identify and contact affected Section 8

14   recipients to ask whether and to what extent they understand that the one-page

15   notice was reducing the rent subsidy they receive from HACLA, and what

16   exposure they had to language used in the notice. The need for this discovery was

17   driven by the decision in *Nozzi I* that there were disputed issues of fact as to

18   whether the notice was understandable. During oral argument in *Nozzi I*, the Court

19   of Appeals, Judge Trott in particular, said that the issue was what a reasonable

20   Section 8 tenant would understand when reading the one-page notice. [Audio of

21   first appellate argument: *Michael Nozzi v. HACLA*, 09-55588, Mosman, Trott,

22   Wardlaw, Pasadena, CA, 12/08/2010] Litt Dec, ¶15.

23       Plaintiffs propounded discovery requests seeking the database in electronic

24   form, from which they could identify Section 8 tenants provided the notice in

25   question, and identify those who paid greater rent as a result of the VPS decrease.

26   Once those preconditions were satisfied, Plaintiffs intended to contact putative

27   class members and ultimately conduct a survey of affected Section 8 recipients,

28   utilizing the services of an expert to construct and conduct the survey. [Doc. #s

150-153.] At the time, Plaintiffs believed that they needed to demonstrate that they would be able to conduct such a survey based on the HACLA electronic data. Litt Dec., ¶17. As Plaintiffs elaborate *infra*, this perceived necessity was obviated when the Ninth Circuit granted of summary judgment to Plaintiffs.

Defendants first produced some of the data Plaintiffs sought on April 10, 2013. [Litt Decl., ¶18.] The April 10 data were sufficient to determine that individual damages class members could be identified, but not to individually identify them. No follow-up occurred at that time due to the grant of Defendants' summary judgment motion and the subsequent appeal. Id.

**E.    *Nozzi II* and Proceedings Thereafter**

In *Nozzi II,* the Ninth Circuit reversed Judge Wu's decision granting summary judgment, holding:

> "There is no genuine dispute of fact as to whether the Housing Authority failed to provide meaningful information to Section 8 beneficiaries about the change to the payment standard and the effect of that change upon the beneficiaries and their property interests. That failure violated both the requirements of the Voucher Program regulations and the requirements of procedural due process. It also resulted in a violation of two state statutes which require public entities to take reasonable efforts to comply with the mandatory duties established by federal regulations."

806 F.3d at 1204.

On February 9, 2016, the mandate issued. On February 10, 2016, this Court was assigned the case  Plaintiffs immediately recommenced communicating with Defendants regarding discovery of the necessary data to identify each class member and the amount of their increased rent as a result of the challenged VPS decrease. On March 24, Plaintiffs sent defense counsel an email setting out the parameters, after extensive consultation with their data experts, of the data they needed. In summary, Plaintiffs requested production in an accessible format of all

1   electronic data (whether stored in EMPHASYS, ELITE, or any other database(s))
2   for all HACLA Section 8 tenants, covering the period January 1, 2003 through
3   December 31, 2007, that appears in or is the source for Sections 9 and 12 of the
4   Family Reports. (The family report is a computer generated report providing a
5   range of relevant information that ultimately determines the tenant's rental share.
6   Sample copies for the two named plaintiffs are exhibits to the Kriegler
7   Declaration.) Plaintiffs also requested identifying and last known contact
8   information for class members. Litt Dec. ¶19. There have been follow-up
9   communications since March 24 on the topic, and HACLA has contacted the
10  company knowledgeable about its former system for assistance. *Id.* at ¶21__.

11          Although Plaintiffs are filing this class certification motion without the
12  benefit of that information, the data that have been produced establishes that their
13  expert will be able to identify each Section 8 beneficiary whose rental contribution
14  rose because his/her VPS was reduced, and how much additional rental
15  contribution that class member made as result (plus interest). *Id.*, ¶22; Brian
16  Kriegler Declaration (hereafter "Kriegler Dec."), ¶¶ 8-20. As we discuss *infra*, that
17  is all that is required at the class certification stage. To certify a class, the Court
18  need not know the precise size and damages of the class; rather, the court must
19  only determine that the applicable Rule 23 factors, including numerosity, are met.
20  Once the necessary data are obtained and analyzed, that information will be
21  available for mediation, for summary judgment motions and for trial.

22  **III.   THE PROPOSED CLASS DEFINITION**

23          Plaintiffs propose the following class definitions. For Rule 23(b)(2), the
24  proposed definition is "All Section 8 beneficiaries who in the past received, or in
25  the future may receive, notices of a Voucher Payment Standard decrease."

26           For Rule 23(b)(3), the proposed definition is narrower: "All Housing
27  Authority of the City of Los Angeles (HACLA) Section 8 tenants, between June 1,
28  2005, and September 30, 2006,  whose rental contribution  for a period not to

1   exceed eleven months was greater than it would have been but for Defendant

2   HACLA's 2004 decrease in the Voucher Payment Standard."

3        Although the defective notice is the operative unlawful act that gives rise to

4   the claim in this case, its incorporation into the Rule 23 (b)(3) class definition is

5   unnecessary. Those who were injured as result of the deficient notice were injured

6   because their rental contribution rose as a result of the VPS decrease, which was

7   supposed to be, but was not, preceded by constitutionally adequate notice. Since

8   the challenged notice was the only one year advance notice HACLA provided, it

9   follows that all those whose rents rose as a result of the VPS decrease were injured

10  due to the failure to provide proper notice. Thus, the proper 23(b)(3) class

11  definition is the one proposed.

12       The 11 (rather than 12) month limitation is included because all class

13  members received  notice one month before the VPS decrease (which the Ninth

14  Circuit referred to as the 'four-week notice,' 806 F.3d at 1186) went into

15  effect. Plaintiffs have never challenged the adequacy of that four-week notice.

16  Twelve months after HACLA issued the four-week notice to each tenant is 11

17  months after the VPS decrease went into effect.  Accordingly, by the twelfth

18  month of the VPS decrease, tenants had received constitutionally adequate notice.

19       In contrast, the 23(b)(2) class definition should be tied directly to the one-

20  year notice because that notice violated the class members' rights, and comparable

21  notice in the future would violate class members' rights.

22  **IV.   PLAINTIFFS MEET THE CRITERIA TO CERTIFY THE CLASS.**

23       The purposes of class actions are to (1) avoid multiplicity of actions and (2)

24  enable persons to assert small claims that could not be litigated individually

25  because the costs would far outweigh any recovery. *See, e.g., Crown, Cork, &*

26  *Seal Co. v. Parker*, 462 US 345, 349 (1983). Class actions "conserve" resources

27  by permitting an issue potentially affecting every class member to be litigated in

28  an economical fashion. *General Telephone Co. of Southwest v. Falcon*, 457 U.S.

147, 155 (1982). The United States Supreme Court and the Ninth Circuit have repeatedly endorsed the class action procedure as the superior method of adjudicating cases with numerous claims too small to litigate individually. *See, e.g.*, *Phillips Petroleum Co v. Shutts*, 472 U.S. 797 (1985); *Blackie v. Barrack*, 524 F.2d 891, 899 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976).

There are four prerequisites of Rule 23(a), all of which are readily satisfied here. We discuss each below, and then discuss the Rule 23(b) requirements.

### A.   Plaintiffs Meet The Requirements Of Rule 23(a).

#### 1.   *Numerosity*

Before the VPS decrease took effect, HACLA's own estimate, as the Ninth Circuit noted, was that approximately 45% of its approximately 45,000 Section 8 participants (approximately 20,000 people) would be adversely affected by the April 2004 VPS decrease, and would have had to pay an average of $104 more in rent each month if they chose to remain in their current units. 806 F. 3d at 1186. Certainly, the class size here far surpasses the size identified as the threshold for class certifications in this circuit. A "class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed.) (hereafter "*Newberg*").[1][2]

At the class certification stage, it "is well settled that a plaintiff need not

---

[1] Newberg is generally considered the authoritative source on class action law and standards, and we draw on it extensively here. The Supreme Court just recently quoted it three times. *See Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 2016 WL 1092414 (Mar. 22, 2016). Similarly, the Ninth and other Circuits regularly cite it. See, e.g., *Melendres v. Arpaio*, 784 F.3d 1254, 1261 (9th Cir. 2015); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

[2] *See, e.g., Gay v. Waiters' & Dairy Lunchmen's Union,* 549 F.2d 1330 (9th Cir.1997) (numerosity met with approximately 110 potential class members); *Leyva v. Buley,* 125 F.R.D. 512, 515 (E.D.Wash.1989) (50-member class); *International Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 102 F.R.D. 457, 461 (N.D. Cal. 1983) (456-member Fourth Amendment class); *Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles*, 246 F.R.D. 621 (C.D.Cal. 2007) (certifying injunctive relief and damages classes for police breakup of May Day march in Los Angeles; estimated number of people who attended the protest was 6000).

allege the exact number or specific identity of proposed class members" and that "a good-faith estimate of the class size is sufficient when the precise number of class members is not readily ascertainable." While the "estimate generally should be supported by more than speculation," numerosity is established when a plaintiff "show[s] enough evidence of the class's size to enable the court to make commonsense assumptions regarding the number of putative class members." *Newberg* § 3:13.[3] Given that HACLA itself has estimated the class size at 20,000, the Ninth Circuit adopted that figure, and HACLA reiterated it in the recent joint status report (*see* Doc. #229, ¶ 8), Plaintiffs have provided sufficient proof of class size by virtue of the undisputed estimated class size and the undisputed fact that HACLA's database systems, specifically its previous system (CCSS8), provide the information sufficient to identify class members and calculate their damages.

### 2. *Commonality*

"[I]n a civil-rights suit, ... commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis,* 275 F.3d 849, 868 (9th Cir. 2001) (citing *LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir. 1985), abrogated on other grounds by *Johnson v. California,* 543 U.S. 499, 504–05, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) What it means for a policy or practice to "affect" a class member requires the possibility of common answers, not just the presence of common questions. *Wal–Mart v. Dukes,* 564 U.S. 338, 131 S.Ct. 2541 (2011). To the extent necessary to determine commonality, the District Court examines the underlying legal merits. *See* 131 S.Ct. at 2551–52; *Jimenez v. Allstate Ins. Co.,* 765 F.3d 1161, 1165 (9th Cir. 2014). That has already occurred in this case.

Commonality is satisfied where the class was harmed "by one or more

---

[3] *See also, e.g., Dennis v. Kellogg Co*., 2013 WL 1883071, 2 (S.D. Cal. 2013); *Keilholtz v. Lennox Hearth Products Inc.*, 268 F.R.D. 330, 336 (N.D. Cal. 2010); *L.H. v. Schwarzenegger*, 2007 WL 662463, at 10 (E.D. Cal. 2007) (all relying on estimated class size to establish numerosity)..

across-the-board practices or policies…" *Gray v. Golden Gate Nat. Recreational Area*, 279 F.R.D. 501, 517–20 (N.D. Cal. 2001) (post-*Wal-Mart*). Such across-the-board issues include organizational policies (or their absence), failure to adequately train or supervise, general practices or customs, and organizational culture. *See e.g., Gray, supra*, 279 F.R.D. at 517–20 (park system's "general practice" of failing to address disability barriers); *Ellis v. Costco Wholesale Corp*., 285 F.R.D. 492, 509–21 (N.D.Cal. 2012) (company-wide policies, the absence of policies, oversight by senior management and company culture all supplied common contentions).

Minor factual differences will not defeat a class action so long as it appears unlikely "that differences in the factual background of each claim will affect the outcome of the legal issue." *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979); *see generally Newberg*§ 3:34 ("actual differences will not render a claim atypical if the claim both arises from the same event or practice or course of conduct that gives rise to the claims of the class members and is based on the same legal theory").

All class members here were subjected to an across-the-board VPS benefit decrease, and provided with the identical one-year notice before the benefit decrease. There are no material factual differences here because *Nozzi II* establishes that the subjective understanding of the notice by individual class members does not matter; the notice was facially unlawful.[4] Liability has been established for the class. Where, as here, "examination of all the class members' claims for relief will produce a common answer" to a central common question, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2552, 180 L. Ed.

---

[4] Before *Nozzi II*, plaintiffs arguably had to establish that the notice was not comprehensible to the average Section 8 beneficiary, and therefore violated due process. This approach would have required showing how Plaintiffs would answer that question (which would have been by conducting a survey of Section 8 tenants drawn from the data HACLA would ultimately produce). After *Nozzi II*, they no longer have to do so.

2d 374 (2011), commonality is met. In *Wal–Mart*—a Title VII discrimination case—the ultimate question was "why was I disfavored." 131 S.Ct. at 2252. After *Nozzi I* and before *Nozzi II,* the first common question was, "was the challenged notice understandable to the average Section 8 tenant?" Now, however, it is "was my portion of the Section 8 tenant rent contribution increased due to the VPS decrease, and by how much?"

The only showing that remains is to demonstrate, once Plaintiffs obtain the remaining and as yet unproduced class data, who the class members are and the amount each paid that s/he would not have paid had the VPS decrease not taken effect. See *Nozzi II*, 786 F.3d at 1204 ("further factual development may be needed to determine the size and validity of plaintiffs' class and to determine the appropriate remedy").

Whether each Plaintiff class member is entitled to restitution as a result of the defective notice is a pure question of law, in light of *Nozzi II*, and it is a common question across the entire class. That meets the commonality standard.

### 3. Typicality

"The commonality and typicality requirements of Rule 23(a) tend to merge." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982); *Stanton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003) (same). The test of typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F. 2d 497, 508 (9th Cir. 1992). Commonality and typicality "mandate only that complainants' claims be common, and not in conflict." *Hassine v. Jeffes*, 846 F.2d 169, 177 (3rd Cir. 1988). Thus, "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Again, *Nozzi II* determined

1    that the defective notice rendered it unlawful as to all affected Section 8

2    beneficiaries. The typicality requirement is satisfied here because Ms. Pelaez, like

3    the other class members, did not receive effective notice that was a precondition

4    for reducing HACLA's VPS. She, like all class members, paid increased rent as a

5    result of the decreased VPS. Thus, her clams are typical.

6                    4.    *Adequacy of Representation*

7            The Ninth Circuit has held that representation is "adequate" when counsel

8    for the class is qualified and competent, the representative's interests are not

9    antagonistic to the interests of absent class members, and it is unlikely that the

10   action is collusive. *In re Northern District of California, Dalkon Shield IUD*

11   *Products Liability Litigation,* 693 F.2d 847, 855 (9th Cir.1982). In addition, the

12   class representative must have a sufficient interest in the outcome of the case to

13   ensure vigorous advocacy. *See Riordan v. Smith Barney,* 113 F.R.D. 60, 64

14   (N.D.Ill.1986). "Adequacy, for purposes of the lead plaintiff determination, is

15   contingent upon both the existence of common interests between the proposed

16   lead plaintiffs and the class, and a willingness on the part of the proposed lead

17   plaintiff to vigorously prosecute the action." *Tanne v. Autobytel, Inc.*, 226 F.R.D.

18   659, 667-68 (C.D. Cal. 2005) (quoting *In re Milestone Scientific Securities*

19   *Litigation,* 183 F.R.D. 404, 416 (D.N.J.1998). A named plaintiff must otherwise

20   meet a fairly low threshold to properly represent the class: "[t]he fact that

21   plaintiffs are familiar with the basis for the suit and their responsibilities as lead

22   plaintiffs is sufficient to establish their adequacy." *Bellinghausen v. Tractor*

23   *Supply Co.*, 303 F.R.D. 611, 616–19 (N.D. Cal. 2014) (quoting *Hodges v. Akeena*

24   *Solar, Inc.,* 274 F.R.D. 259, 267 (N.D.Cal. 2011).

25           Although this case was initially filed with two named individual plaintiffs

26   and one named organizational plaintiff, the passage of time has affected the

27   availability of two of those parties to serve as a class representative. Michael

28   Nozzi appears to be unavailable to act as a class representative. Litt Dec., ¶24. The

1  Coalition to End Hunger and Homelessness has closed its doors. *Id.*  All of the

2  adequacy of representation criteria are met as to Ms. Pelaez, and only one class

3  representative is sufficient. *See Newberg* § 2:8 (5th ed.) ("A class action can be

4  maintained by one class representative with proper standing" (citing Fed. R. Civ.

5  P. 23(a), which state, "*[o]ne* or more members of a class may sue or be sued as

6  representative parties on behalf of all members …") (emphasis added in

7  *Newberg*). *See also, e.g., Blackie v. Barrack*, 524 F.2d 891, 911 (9th Cir. 1975)

8  (referencing "numerous cases in which even one representative has been held

9  adequate to represent a prolonged class"); *Polanco v. Schneider Nat. Carriers,*

10  *Inc.*,  2012 WL 10717265, at 3 (C.D. Cal. Apr. 25, 2012) ("only one class

11  representative must be adequate," citing Ninth Circuit cases verifying adequacy of

12  a single plaintiff).[5]

13      Ms. Peleaz has submitted a declaration explaining that she is prepared to

14  continue pursuing this case through resolution; that she has no conflicts with, and

15  her interests are not antagonistic to, other class members; that, like other class

16  members, her rental contribution rose as a result of the challenged VPS reduction;

17  that she is familiar with and generally understands that the lawsuit challenges the

18  underlying notice and any increased rental contributions by tenants that resulted

19  from the VPS decrease that the notice was supposed to convey; and that she

20

21  _____

[5] Plaintiffs see no need to add additional named plaintiffs to serve as class
22  representatives at this time, but are prepared to file a motion to intervene or motion to
substitute on behalf of additional persons to act as class representatives, if for some
23  unknown reason Ms. Peleaz becomes unavailable, or is deemed inadequate, to act as a
class representative. *See, e.g., Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401,
24  1405, n. 1 (9th Cir.1989) ("[A] member of a class should have the right to intervene in a
class action if he can show the inadequacy of the representation of his interest by the
25  representative parties before the court"); *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D.
193 (S.D.N.Y.1992) ("Intervention of class representatives to ensure adequate class
26  representation is highly desirable"); *Munoz v. PHH Corp.*, No. 2013 WL 3935054 (E.D.
Cal. July 29, 2013) (granting motion to intervene after finding that previously named
27  class representative was inadequate due to lack of typicality).

28

1   understands her responsibilities. *See* Declaration of Nidia Pelaez. This case has

2   been prosecuted vigorously for many years and continues to be.

3        With regard to class counsel, the following considerations are identified by

4   F.R.Civ.P. Rule 23(g)(1): (i) the work counsel has done in identifying or

5   investigating potential claims in the action; (ii) counsel's experience in handling

6   class actions, other complex litigation, and the types of claims asserted in the

7   action; (iii) counsel's knowledge of the applicable law; (iv) the resources that

8   counsel will commit to representing the class, as well as any other matter relevant

9   to assessing counsel's ability to fairly and adequately represent the interests of the

10  class. In addition, like the named plaintiff, counsel must be able to fairly and

11  adequately protect the interests of the class and not have conflicts with it.

12  F.R.Civ.P. Rule 23(a)(4).

13       These criteria are also met. The current counsel have pursued this case for

14  many years through hard fought litigation in the district court and through two

15  appeals. Plaintiffs' counsel include Barrett S. Litt of Kaye, McLane, Bednarski &

16  Litt, and Anne K. Richardson of Public Counsel (formerly of Hadsell, Stormer,

17  Richardson & Renick). Both have extensive class action experience, as their

18  Curriculum Vitae (attached to Mr. Litt's and Ms. Richardson's declarations)

19  demonstrate. Mr. Litt is or has been lead or co-lead counsel in over a dozen

20  certified class actions, and acts in the same capacity in several others where class

21  certification is pending. See Litt CV. Ms. Richardson has also been co-lead

22  counsel in numerous certified class actions and complex cases, and Public Counsel

23  has and is currently litigating numerous complex class actions. *See* Richardson

24  Dec., CV.

25       All the criteria set forth in Rule 23(g) are present here, i.e., (a) counsel have

26  identified and investigated the potential claims in the case, (b) counsel have

27  extensive experience in handling similar cases, (c) counsel are well versed in the

28  applicable law, and indeed have often made the law, and (d) counsel have the

1  resources necessary to prosecute the case.

2      **B.**    **The Requirements Of Rule 23(B)(2) and (3) Are Met.**

3      Plaintiffs are seeking certification under F.R.Civ.P. Rule 23(b)(2) and

4  (b)(3). "In order to be maintained as a class action, a representative suit must

5  comply with the requirements of each of the four subsections of Rule 23(a), and

6  must satisfy the additional requirements of at least one of the three subdivisions of

7  Rule 23(b)." *Newberg* § 4:1. Plaintiffs concentrate on Rule 23(b)(3) since their

8  request for relief includes monetary relief in the form of restitution (plus interest).

9  Rule 23(b)(2) is easily met since it only requires a determination already made by

10  *Nozzi II* — that the opposing party "has acted or refused to act on grounds

11  generally applicable to the class, thereby making appropriate final injunctive relief

12  or corresponding declaratory relief with respect to the class as a whole. The key to

13  a (b)(2) class is that the conduct at issue "is such that it can be enjoined or

14  declared unlawful only as to all of the class members or as to none of them." *Wal–*

15  *Mart Stores, Inc. v. Dukes, supra*, 131 S.Ct. at 2557 (internal quotations and

16  citations omitted).

17      Rule 23(b)(3) provides that certification should be granted where the

18  common questions predominate, and a class action is superior to other available

19  methods for the fair and efficient adjudication of the controversy. It identifies

20  several factors, each of which we discuss.

21          *1.*    *Common Questions of Law or Fact Predominate*

22      The first requirement is that common factual and legal issues predominate

23  over any such issues that affect only individual class members. The Supreme

24  Court just recently summarized the predominance inquiry as follows in *Tyson*

25  *Foods, Inc. v. Bouaphakeo*, 2016 WL 1092414, at *7 (U.S. Mar. 22, 2016):

26      The 'predominance inquiry tests whether proposed classes are sufficiently

27      cohesive to warrant adjudication by representation.' *Amchem Products, Inc.*

28      *v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.' 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012) (internal quotation marks omitted). The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' *Id.,* § 4:49, at 195–196. When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.' 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005) (footnotes omitted).

Because *Nozzi II* established that the notice violated Plaintiffs' rights as a matter of law, the claim not only is "is susceptible to generalized, class-wide proof," but has been found to have been proven on a class-wide basis. *See also* Joint Status Report, Doc. #229, ¶ 7 (*Nozzi II* "decided liability issues only as to all the plaintiffs who are Section 8 recipients that both received the subject Voucher Payment Standard (VPS) notice, and had their rent increased as a result"). Thus, common questions predominate (and have been answered) on liability.

As to damages, damages are common and manageable, and thus predominate, where they are readily subject to mathematical calculation and determination. As we discussed in the Statement of Facts, computerized records show how much each class member paid based on the unlawful VPS decrease.

Although Plaintiffs still require some additional information from HACLA, the available data demonstrate that this determination can be made. *See* Litt Dec., ¶25; Kriegler Dec., ¶¶ 8-20.[6] The propriety of applying a pre-determined mathematical formula to class compensatory damages is well-recognized. *See, e.g., Newberg* § 12:5 (proving damages through a common formula applied to the individual circumstances of each class member is "well-established"; so "long as there is a common formula to the class, predominance is satisfied").[7] This principle was acknowledged by the Supreme Court in *Tyson Foods supra* even though there, unlike here, only sampling evidence was available from which to determine damages, so long as the methodology could separate uninjured from injured class members. 2016 WL 1092414 at 12.

Even if the Court were to find that class damages were not readily calculable by a mathematical formula, common issues predominate on liability alone and individual damages are not a reason not to certify, for "damage calculations alone cannot defeat certification." *Leyva v. Medline Indus.,* 716 F.3d 510, 513 (9th Cir. 2013) (citing *Yokoyama v. Midland Nat'l Life Ins. Co.,* 594 F.3d 1087, 1094 (9th Cir. 2010)).

---

[6] Plaintiffs realize that the Court must separately resolve whether, as Plaintiffs contend, the appropriate remedy is reimbursement of the unlawful rent payments made, plus an appropriate interest factor. The point presently is that, if Plaintiffs are so entitled, such money payments qualify for class treatment. It is thus a common question subject to a common answer.

[7] See, e.g., *Klay v. Humana, Inc.,* 382 F.3d 1241, 1259–60 (11th Cir. 2004) ("where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification"); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) ("Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim."); *Negrete v. Allianz Life Ins. Co. of N. Am.,* 238 F.R.D. 482, 494 (C.D. Cal. 2006) (same, citing *Klay* and *Smilow*); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 WL 4776932, at 15 (C.D. Cal. May 27, 2015) (commonality predominated where damages were subject to formula calculation).

2.       *The Other 23(b)(3) Considerations Favor Certification.*

In addition to predominance, Rule 23(b)(3) considers several factors to determine superiority, including: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Rule 23(b)(3).

Interest in individually controlling the litigation. Class members have no interest in individual control where, as here, the damages are small and class members do not have an emotional connection to the litigation. *See, e.g., Newberg,* §4:69; *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 652 (C.D. Cal. 1996). Here, damages are in the four digit range, typically less than $2,000. It is unlikely that any individual would litigate over that amount, particularly given the monetary and time costs of litigation.

There is no pending litigation, and any litigation would be concentrated in the Central District. The events all arose in the City of Los Angeles, and Plaintiffs are unaware of any other pending litigation. Litt Dec., ¶26_. Given the length of time that has passed, they would know if there were any other similar litigation. *See, e.g., Wolph v. Acer America Cor*p., 272 F.R.D. 477, 489 (N.D. Cal. 2011) ("There is no other pending litigation that relates to the issues raised herein. Thus, the first two factors weigh in favor of certification."); *Schramm v. JPMorgan Chase Bank*, N.A., 2011 WL 5034663, *14 (C.D. Cal. 2011) (same).

Manageability and superiority. As mentioned, *Nozzi II* found liability for the class, making the class liability inquiry obviously superior and manageable. Because HACLA maintains a database that contains the essential information for (a) determining class membership, (b) determining class damages, and (c)

contacting class members, there are no manageability concerns in certifying this case as a class action. Indeed, in much more problematic situations, courts find superiority and manageability met given that the "Ninth Circuit, along with at least seven other circuits, has held that there is a presumption against dismissing a class action on manageability grounds or that such dismissals are typically disfavored." *Fraser v. Wal-Mart Stores, Inc*., 2014 WL 7336673, *8 n.5 (E.D. Cal. 2014).

Ascertainability. While ascertainability is not an express provision of Rule 23, many courts require that ascertainability (or class definiteness) be established as part of the Rule 23 analysis. Since the inquiry is often part of the manageability analysis, Plaintiffs address it here. While there are different formulations for acertainability, the "focus [is] on the question of whether the class can be ascertained by objective criteria.…However, the court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding." *Newberg* § 3:3. As indicated, when the full data are produced, Plaintiffs will be able to determine each class member and his/her increased rental contributions. It is sufficient for class certification that Plaintiffs have demonstrated that they will be able to do so.

Class Notice. Class notice will be readily accomplished by drawing on HACLA's database, and updating addresses. The designated class administrator would update the addresses where necessary, making it realistic to reach the great majority of class members. This is a standard class administration practice. *See* Litt Dec., ¶27. Plaintiffs recommend that class notice not be sent until either a settlement is reached or the remedy issue is resolved, in order to avoid the expense of sending two notices close together. Litt Dec., ¶28.

**V.     THE NINTH CIRCUIT'S DECISION IN NOZZI II AT LEAST IMPLICITLY DECIDED MANY OF THE RULE 23 ISSUES.**

*Nozzi II* decided, at least implicitly, most of the Rule 23 issues, and

constitutes the law of the case. "Under the law-of-the-case doctrine a decision of the court in a prior appeal must be followed in all subsequent proceedings in the same case." *Eichman v. Fotomat Corp.*, 880 F.2d 149, 157 (9th Cir. 1989). The doctrine "'encompasses a court's explicit decisions as well as those issues decided by necessary implication.'" *Id.* (quoted citation omitted). Accordingly, this Court should apply any determination decided "explicitly or by necessary implication by the same court or by a higher court in the identical case." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012).[8]

"'The rule of mandate is similar to, but broader than, the law-of-the-case doctrine.'" *Hall*, 697 F.3d at 1067 (quoting *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995)). "A District Court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it." *Id.* "Violation of the rule of mandate is a jurisdictional error." *Id.* "The rule of mandate requires that the lower court's actions be consistent with both the letter *and the spirit* of the higher court's decision. *See Quern v. Jordan*, 440 U.S. 332, 347 n.18, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (looking to whether post-mandate conduct of lower court was consistent 'with either the spirit or the express terms of our decision')." *Ischay v. Barnhart*, 383 F. Supp. 2d 1199, 1214–15 (C.D. Cal. 2005) (original emphasis in *Ischay*).

As we have periodically referenced in the previous discussion, the Ninth Circuit decision explicitly or implicitly decided many if not most of the Rule 23 issues. While the Ninth Circuit did not decide the question of class certification directly, it anticipated that the next step was to certify a class. It noted that Nozzi and Pelaez were "putative class representatives of a group of tenants." 806 F.3d at 1183.

The Ninth Circuit noted the undisputed evidence that the class was

---

[8] That the law of the case doctrine encompasses the necessary implication of the previous decision is a formulation throughout the Circuits. § 4478 Law of the Case, 18B *Fed. Prac. & Proc. Juris.* § 4478 (2d ed.) (citing cases at Fn. 29 from the 2nd, 3rd, 4th, 5th , 6th, 7th, 8th, 9th, 11th, and Fed. Circuits.

1   estimated at 45% of the approximately 45,000 Section 8 tenants (approximately
2   20,000), thus establishing numerosity. *Id*. at 1186. It determined that the one-year
3   notice would not have been understandable to Section 8 tenants in general, and
4   violated due process as to all the beneficiaries:

5       "The flyer was, without doubt, entirely insufficient to meet this standard [of
6       due process notice]. In no respect does it reasonably inform its intended
7       recipients of the changes to the payment standard, the meaning of those
8       changes, or, most important, their effect upon the recipient. Because of this,
9       Section 8 beneficiaries were not meaningfully advised regarding the
10      payment standard and were, accordingly, deprived of their right to a one-
11      year term of stable benefits in which to plan for the impending potential
12      hardship." *Id*. at 1194.[9]

13      This determination, by necessary implication, means that the elements of
14  commonality and typicality are met (leaving, of the Rule 23(a) factors, only the
15  adequacy of the class representatives and of class counsel, both discussed and
16  established *supra*).

17      This determination also means by necessary implication that, with the
18  exception of the then yet to be established ascertainability of the class members
19  (which required evidence, not at that time in the court record, that the class data
20  allowed such a determination), the class action mechanism is superior and the

21  _____

22  [9] *See also id*. ("to the ordinary Section 8 beneficiary, the flyer might well suggest that the
    beneficiary's expected rent contribution would decrease"); *id*. at 1198–99 ("Notably
23  missing from the list of people who received an adequate explanation are the people who
    needed it most—the same people that due process requires receive adequate notice—
24  those Section 8 beneficiaries whose rent might actually be increased by the change"); *id*.
    at 1199 (The Housing Authority's flyer…was inadequate on its face"); *id*. at 1201 ("A
25  mandatory obligation to provide notice includes the obligation to provide an intelligible
    notice that can be understood by its average intended recipients"); *id*. at 1204 ("There is
26  no genuine dispute of fact as to whether the Housing Authority failed to provide
    meaningful information to Section 8 beneficiaries about the change to the payment
27  standard and the effect of that change upon the beneficiaries and their property
    interests").
28

1   class is manageable. Plaintiffs have established that, although the class data

2   presently turned over to Plaintiffs does not allow identification of the individual

3   class members without additional information, the data will allow such a

4   determination when all of it is provided. *See* Litt Dec., ¶22; Kriegler Dec., ¶¶ 8-

5   20.

6   **VI.    CONCLUSION**

7          For the foregoing reasons, Plaintiffs respectfully request that the Court grant

8   their Motion for Class Certification.

9   Dated: April 1, 2016              Respectfully submitted,

10

11                                     KAYE, MCLANE, BEDNARSKI & LITT

12                                     By:__/s/ Barrett S. Litt_____

13                                      Barrett S. Litt

14                                     PUBLIC COUNSEL

15

16                                     By:__/s/ Anne K. Richardson_____

17                                      Anne K. Richardson
                                       Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX**

# HOUSING AUTHORITY OF THE CITY OF LOS ANGELES

## NOTICE

Effective April 2, 2004 the Housing Authority lowered the payment standards used to determine your portion of the rent.   We will not apply these lower payment standards until your next regular reexamination. If you move, however, these new lower payment standards will apply to your next unit.

## PAYMENT STANDARDS and
## TENANT-BASED SHELTER PLUS CARE PAYMENT STANDARDS
## EFFECTIVE APRIL 2, 2004

| Bedroom Size | Payment Standard |
|---|---|
| Mobile H. Space | $463 |
| SRO | $505 |
| 0 | $674 |
| 1 | $807 |
| 2 | $1,021 |
| 3 | $1,378 |
| 4 | $1,646 |
| 5 | $1,892 |
| 6 | $2,139 |
| 7 | $2,386 |

Regardless of its location, the unit's rent can never be higher than the comparable rents determined by the Housing Authority.

En Español   ⇒

VPSdecrease0404

H00005

Ex. 2-1

117

## AUTORIDAD DE LA VIVIENDA DE LA CIUDAD DE LOS ANGELES

### AVISO

Efectivo el día 2 de Abril del 2004, la Autoridad de la Vivienda bajará los pagos fijos que se usan para determinar la porción de su alquiler. No usaremos estos pagos fijos más bajos hasta su próxima revisión anual. Si usted se muda, estos pagos fijos serán aplicados en su nueva unidad.

### PAGOS FIJOS DE VALÉ
### PROGRAMA DE CERTIFICADOS DE "SHELTER PLUS CARE"
### EN VIGENCIA A PARTIR DEL 2do DE ABRIL, 2004

| Numero De Recamaras | Pagos Fijos De Vale |
|---|---|
| Espacio Para Casa Mobil | $463 |
| SRO | $505 |
| 0 | $674 |
| 1 | $807 |
| 2 | $1,021 |
| 3 | $1,378 |
| 4 | $1,646 |
| 5 | $1,892 |
| 6 | $2,139 |
| 7 | $2,386 |

Sin importar su ubicación, el alquiler de la unidad nunca puede ser más alto que los alquileres comparables determinados por la Autoridad de la Vivienda.

VPSdecrease0404

H00006

Ex. 2-2

118